**UNITED STATES DISTRICT COURT**
**SOUTHERN  DISTRICT OF NEW YORK**
_____

ROKAYIA AGLONU,

                Plaintiff,

              v.

PETER T. ROACH & ASSOCIATES, P.C. and
STEPHEN EINSTEIN & ASSOCIATES, P.C.

                Defendants.

_____

Civil Action No. 14-cv-08399

HON. VINCENT L. BRICCETTI


**OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO ALL DEFENDANTS'**
**MOTIONS TO DISMISS**


March 4, 2015


Daniel A. Schlanger, Esq.
Schlanger & Schlanger, LLP
343 Manville Road
Pleasantville, NY 10570
T. (914) 946-1981, ext. 101
F. (914) 946-2930
daniel.schlanger@schlangerlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN  DISTRICT OF NEW YORK**
_____

ROKAYIA AGLONU,                                    Civil Action No. 14-cv-08399

              Plaintiff,                               HON. VINCENT L. BRICCETTI

                v.

PETER T. ROACH & ASSOCIATES, P.C. and
STEPHEN EINSTEIN & ASSOCIATES, P.C.

              Defendants.


_____



**OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO ALL DEFENDANTS'
MOTIONS TO DISMISS**




March 4, 2015




                                   Daniel A. Schlanger, Esq.
                                   Schlanger & Schlanger, LLP
                                   343 Manville Road
                                   Pleasantville, NY 10570
                                   T. (914) 946-1981, ext. 101
                                   F. (914) 946-2930
                                   daniel.schlanger@schlangerlegal.com

                                   *Counsel for Plaintiff*

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     STATEMENT OF FACTS ...................................................................................... 4

III.    PROCEDURAL HISTORY OF THE INSTANT ACTION ..................................... 7

IV.     ARGUMENT ........................................................................................................ 9

   A.   PTR's Statute of Limitations Argument Fails ................................................ 9

      1.   *Plaintiff Is Entitled To Equitable Tolling* ................................................ 10

      2.   *Plaintiff Is Entitled To Discovery Rule Tolling* ...................................... 15

   B.   PTR's Extrinsic Evidence Cannot Be Considered At This Stage Of The Litigation, Is Not In Admissible Form, And Is, In Any Event, Contested ......................................... 21

      1.   *PTR's Extrinsic Evidence Cannot Be Considered At The 12(b)(6) Stage* .................. 21

      2.   *The 2011 Letter Is Not In Admissible Form.* ............................................ 23

      3.   *PTR's Allegations Regarding The November 2011 Letter Are Contested* ................. 25

   C.   Defendant SEA's Motion Likewise Fails .................................................... 26

      1.   *12(b)(6) Motion Should Not Be Transformed Into A Motion For Summary Judgment Because There Has Been No Discovery And The Record Is Undeveloped* ........................ 27

      2.   *SEA's Extrinsic Evidence, Including the November 2013 Letter, Should Be Rejected As Inadmissible* ......................................................................... 29

      3.   *Disputed Issues Of Material Fact Abound* .............................................. 30

      4.   *SEA Misconstrues Aglonu's Allegations Regarding The November 2013 Letter And Errs In Asserting That It Was Entitled To Press Forward With Collection On A Judgment It Knew To Have Been Obtained By Deceit* ................................................ 33

V.      CONCLUSION .................................................................................................. 36

Plaintiff Rokayia Aglonu ("Plaintiff") by and through her attorneys, Schlanger & Schlanger, LLP, respectfully submits this omnibus memorandum of law in opposition to Defendants' respective motions to dismiss.  For the reasons stated herein, the Court should deny Defendants' motions in their entirety.

## I.       PRELIMINARY STATEMENT

Plaintiff Rokayia Aglonu works as a nurse's aide.  Her husband, Abdul Wahab Leo likewise works as a nurse's aide.  Their severely disabled son, Akim, was seriously injured and received extensive medical services at Westchester Medical Center in 2008 when he was four years old.  The bill totaled over $160,000.  As eye-popping as this balance was, there should have been no issue regarding payment as Akim has both primary insurance -- offered through Mr. Leo's union, SEIU 1199 -- as well as Medicaid coverage.  Unfortunately, WMC failed to bill SEIU 1199 timely, despite having been in possession of the child's insurance information, and billed only Medicaid.

Medicaid, for its part, originally paid over $109,000 on the claim but recouped these funds 22 months later when it determined that the primary insurer, SEIU 1199 had never been billed.  It is uncontested that (1) Medicaid was entitled to do so, as it functions only as the payor of last resort and (2) as a condition of accepting Medicaid payments, WMC waived its right to seek any funds personally from Akim or his parents.

The story should thus end here as a cautionary tale for WMC regarding the importance of proper health insurance billing.  Unfortunately, the narrative has an ugly second chapter:  Rather than reviewing the file and giving their client WMC the bad news, Defendants – two high volume collection law firms – attempted through lies and deception to strong-arm Mrs. Aglonu

1

into personal liability for the $160,000 bill, in essence attempting to financially destroy her and her family to compensate for its client's billing error.

Specifically, Defendant Peter T. Roach & Associates ("PTR"), filed a state court complaint against Mrs. Aglonu (misnamed as "Rokayia Wahab") that consisted entirely of overt falsehoods and material omissions: the state court complaint represented that Mrs. Aglonu, not Akim, had received medical services; that she had signed a contract regarding same; that she had been billed; and that no payments had ever been made, etc. It is undisputed that these falsehoods violate the Fair Debt Collection Practices Act ("FDCPA"). It is also undisputed that PTR failed to meaningfully review the file prior to filing the state court complaint, again in violation of the FDCPA.

PTR made matters worse when it failed to serve Mrs. Aglonu with the summons and complaint in the state court action and then took a default judgment against her for $160,591.92, including in its motion for default additional sworn statements that continued to entirely misrepresent the history of the account.

At no point did PTR inform the state court that the services were in fact rendered to Akim, nor that Medicaid had originally paid the claim but later recouped its payment when it determined that WMC failed to seek payment from SEIU 1199, as required.

Defendant Stephen Einstein & Associates ("SEA") then took over the file and proceeded to garnish Mrs. Aglonu. It is undisputed that SEA knew at the time it did so that the services were in fact rendered to Akim, not Mrs. Aglonu; that Akim had both primary insurance with SEIU 1199 and secondary insurance with Medicaid; and that Medicaid had recouped based on WMC's failure to bill SEIU 1199. In short, SEA knew at the time it sought to collect on the

judgment that virtually every representation that had been made to the state court in the course of obtaining that judgment was false.

It is undisputed the SEA did nothing to inform the state court and merely continued to enforcement the judgment it knew to be infirm.

PTR's defense is based on statute of limitations.  Principally, PTR seeks to leverage the fact that it never served Ms. Aglonu with the summons and complaint, claiming that because she only found out about the judgment two years after she had been sued when she was garnished, her claims are time barred under the FDCPA's one-year statute of limitations.

To state PTR's argument is to understand the perverse incentives its adoption would create.  Well-established doctrines regarding the discovery rule and equitable tolling exist for precisely the sorts of circumstances alleged here by Plaintiff and have been repeatedly applied to the FDCPA by numerous district and appellate courts.

SEA argues that it was retained after judgment had been taken and that, although it was aware of the falsity of the underlying court papers at the time it attempted to garnish Mrs. Aglonu, it's conduct was justified by the existence of the judgment, upon which it was entitled to rely.  This, too, is not the law.  Rather, upon becoming aware that the judgment was based on fraud, SEA's continued collection without, at a minimum, informing the consumer and the state court of same was unlawful.  In addition, separate and apart from the violations referenced to this point, SEA is liable because the letter it sent Mrs. Aglonu in November 2013 failed to include numerous statutorily required discosures.

Finally, the attempts by both Defendants to introduce and rely on extrinsic evidence in support of their respective motions must fail.  Indeed, even were such evidence properly considered at this stage of the litigation (and it is not), and even were such evidence submitted in

admissible form and of uncontested authenticity (and it is not), it is clear that disputes regarding material facts (including what documents Mrs. Aglonu received from Defendants, and the contents of her telephone conversations with SEA's debt collection staff) abound.

## II.   <u>STATEMENT OF FACTS</u>

Plaintiff's severely disabled son was badly injured on March 17, 2008.  He was four years old at the time.  *First Amended Complaint (*hereafter *"Complaint)* at 24.

Extensive medical care was required, and the boy – Akim Wahab – was treated at Westchester Medical Center ("WMC" or "the hospital").  *Id.*

Akim had suffered extensive health problems connected to his disability since birth, and had been treated at WMC numerous times previously.  *Id.* at 21, 25-26.  For this reason, WMC was in possession at all relevant times of his health insurance coverage information, including his primary insurance -- offered through SEIU 1199 ("1199") by virtue of Akim's father being a union member) -- and his secondary insurance, provided by Medicaid.  *Id.* at 22, 25.

Due to a flagrant and obvious billing error, and unbeknownst to Plaintiff at the time, WMC failed to submit a timely claim to 1199, and submitted the claim only to Medicaid.  *Id.* at 29-31.

This, of course, violated both federal and state law, which requires a hospital that accepts Medicaid to bill primary insurance first and only then bill Medicaid for any difference.  *Id.* at 30.  See, e.g. 18 NYCRR 540.6(e); 42 U.S.C. § 1396a(a)(25); *Rego Park Nursing Home v. Perales*, 206 A.D.2d 781, 783-784 (N.Y. App. Div. 3d Dep't 1994)("It is well established that Medicaid is the payor of last resort, which means that a provider of services must first seek and exhaust payment for services rendered to an eligible recipient from all other sources including Medicare benefits.").  Where the insurer fails to do so, Medicaid is entitled to reject the claim, and the medical provider must then address the error and, in the event of any shortfall, resubmit the claim

4

to Medicaid.  In addition, as a condition of accepting Medicaid funds, WMC agreed not to seek any additional balance beyond Medicaid's payment from Medicaid recipients.  See, *e.g.*, 42 C.F.R. § 433.139(b); *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 811-812 (Cal. 2003).  See also, *Glengariff Corp. v. Snook*, 122 Misc. 2d 784, 787-790 (N.Y. Sup. Ct. 1984).

In April, 2008, despite not being the primary insurer, Medicaid paid over $109,000 on Akim's claim.  However, some 22 months later, in February 2010, the Office of the Medicaid Inspector General caught the error, and notified the hospital that because the primary insurance carrier had not been billed first, Medicaid was retroactively denying the claim and was recouping all monies previously paid.  *Complaint* at 29-31.

It is undisputed that Medicaid was entitled to do so based on WMC's failure to bill Akim's primary insurer.

Defendant PTR, a high volume debt collection law firm whose conduct is governed by the FDCPA, subsequently initiated an action on behalf of WMC in Westchester County Supreme Court against Mrs. Aglonu ("the State Court Action") on April 25, 2011, seeking $160,056.92 from her, personally.  *Id*. at 32.

The state court complaint was false in virtually every material respect.   To wit, the State Court Complaint claims that Ms. Aglonu (who was misnamed as "Rokayia Wahab" a name she has never used) "entered into an agreement whereby [WMC] would render medical services to [Aglonu] at an agreed-upon value."  *Id*. at 34.

In reality, Mrs. Aglonu's son, not Mrs. Aglonu, was the recipient of the medical services in question, and there was no such agreement between Mrs. Aglonu and WMC.  *Id*. at 35.

The state court complaint further states that "[u]pon information and belief, Defendant(s) defaulted on payment for medical services rendered and now owes a balance of $160,056.92, plus

5

interest at the statutory rate of 9% from the date of this complaint, no part of which has been paid despite due demand thereof." *Id*. at 36.

This too is false, as "(a) there was never any demand for payment and (b) the plaintiff Westchester Medical Center had, in fact, received payment for its services from Medicaid, on or about April 28, 2008 which was not disclosed to the Court." *Id.* at 37.

The state court complaint likewise falsely states that Mrs. Aglonu "accepted and received the benefits of the services rendered by Plaintiff." *Id.* at 38.

As set forth in the Complaint, "this statement is false because the Defendant was never a patient at Westchester Medical Center and received no medical services there." *Id*. at 39.

The state court complaint was also false by way of material omission, as it omitted any reference to the fact that Akim had primary insurance at 1199; that this insurance had never been billed; that Medicaid had, learning of this, recouped its payment; and more generally, that the state court action was an attempt to hold Plaintiff personally liable in light of Medicaid's determination that 1199 should have been billed paired with WMC's inability to obtain compensation from 1199 years after Akim had received treatment. *Complaint* at 76, 80.

Mrs. Aglonu was not served with the Summons and Complaint in the state court action, and only received notice of the action when she learned of a wage garnishment against her in November 2013. *Complaint* at 44-45, 63-64, 70. [1]

PTR, on behalf of its client WMC, took a default judgment against Mrs. Aglonu in November 2011 *Id*. at 50.

As part of its motion for default, PTR submitted an affidavit dated September 22, 2011, sworn to by Marie Caprio of WMC, which was materially false in all material respects, again

---

[1] By Order dated February 2, 2015, this Court ruled that "the reference in para. 70 [of the Amended Complaint] to November '2012' is plainly a typo, and is therefore corrected nunc pro tunc to read November 2013". *ECF Doc. 17*.

stating that Mrs. Aglonu had received the services in question and again stating that no payments had been made despite being duly demanded and failing to mention any of the pertinent facts. *Id.* at 47-48.

In November 2013, Einstein first communicated in writing with Aglonu, sending her a bill from WMC along with a cover note that unequivocally indicated that Defendant Einstein knew that Akim had primary insurance that had not been timely billed by WMC.  *Id*. at 52, 55.

Specifically, the handwritten cover note from Raymond Goodsen, a non-attorney debt collector at Defendant Einstein ("the Goodsen Letter") stated:  "Here's the itemized statement, to help you get 1199 to open the case".  *Id.* at 53.

The Goodsen letter was Einstein's initial communication with Mrs. Aglonu, but did not contain any of the statutorily required disclosures applicable to initial communications pursuant to 15 U.S.C. 1692g.  *Id*. at 57.

By Order dated December 9, 2014, following a traverse hearing, the state court action was dismissed for lack of service, with the state court concluding after hearing testimony from Mrs. Aglonu, her husband, and the process server that "key elements of [the process server's] Affidavit of Service are contradicted or at the very least called into question by testimony and evidence adduced at the hearing."  *Id*. at 59.

### III.   <u>PROCEDURAL HISTORY OF THE INSTANT ACTION</u>

Plaintiff filed the instant action on October 21, 2014, alleging claims under the Fair Debt Collection Practices Act, 15 U.S.C. 1692, *et seq*.  *ECF Doc. 1*.

By Order dated December 23, 2014, this Court granted Plaintiff leave to amend her complaint.  *ECF Doc. 9*.  The first amended complaint, filed on January 12, 2015, states the following FDCPA violations:

75 . . .

      a.      Defendant Roach violated the FDCPA by falsely representing that Aglonu was herself a patient; that Aglonu had received medical care from Westchester Medical Center; that Aglonu had been billed for the services she received; and that Westchester Medical Center had not received payment for its services.  These statements violate 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(5), 1692e(10), 1692f, and 1692f(1);

      b.      Defendant Roach failed to make a meaningful review of the file prior to filing a complaint in State Court and again when seeking a default judgment, in violation of 15 U.S.C. §1692e(3);

      c.      Defendant Einstein violated the FDCPA by failing to include the required disclosures necessary under the FDCPA in an initial communication from a debt collector, in violation of  15 USC § 1692g(a);

      d.      Both Roach and Einstein violated the FDCPA by attempting to collect a debt which could not legally be collected, in violation of 15 USC §§ 1692e(2)(A), 1692e(5), 1692e(10), 1692f, and 1692f(1).

76.     Both Roach and Einstein, in using the State Court Action to attempt to collect this purported medical debt, made false and misleading representations: anyone reading the file of the State Court Action would be gulled into believing that this was a simple case of a patient who had received services that were not covered by insurance and simply refused to pay.

77.     Instead, the facts show that Westchester Medical Center that knew about the family's (two!) insurances but failed to bill the private insurer properly before resorting to Medicaid.

78.     Indeed, a basic review of the file would have revealed that Westchester Medical Center improperly billed Medicaid directly and as a result pocketed a six-figure payment that it was later forced to disgorge.

79.     At that point, Westchester Medical Center could have and should have limited itself to attempting to bill SEIU (whose information WMC had on file for the Akim at all relevant times), even if its tardiness in doing so limited recovery.

80.     Instead, WMC's attorneys – the Defendants in this action – chose to file a deceptive state court action that attempted by means of a host of false and misleading statements to obscure the file's mishandling and misrepresent the case as one involving simple non-payment by a patient who had received medical services but refused to pay.

81.     In short, the entire course of action of their attorneys was filled with false and misleading representations, in violation of 15 USC §§ 1692e(2)(A), 1692e(5), 1692e(10), 1692f, and 1692f(1).

*Complaint* at 75-80.

PTR filed its motion to dismiss under Fed. R. Civ. P. 12(b)(6) on January 28, 2015.  *ECF Doc. 13*.

SEA filed its motion to dismiss under both Fed. R. Civ. P. 12(b)(6) and 12(d) (*i.e.*, requesting that the motion be converted to one for summary judgment governed by Fed. R. Civ. P. 56) on February 4, 2015.  *ECF Doc. 18* (subsequently re-filed at instruction of docketing clerk, see ECF clerk entries dated February 4-5, 2015).

## IV.    ARGUMENT

### A.  PTR's Statute of Limitations Argument Fails

PTR argues that it is entitled to dismissal under Fed. R. Civ. P. 12(b)(6) because it took judgment against Ms. Aglonu in the state court action in November 2011, but her FDCPA complaint was not brought until October 2014, and is thus outside the FDCPA's one year statute of limitations.

Specifically, while acknowledging that Plaintiff alleges that "it was not until sometime in November 2013 that Plaintiff discovered the judgment against her existed", PTR contends that this is irrelevant because the "discovery rule" does not apply to the FDCPA.  *PTR Opp*. at 4-6, citing *Benzemann v. Citibank, N.A.*, 2014 U.S. Dist. LEXIS 109939 (S.D.N.Y. 2014).

As set forth below, PTR's argument fails for several reasons:  Plaintiff does not rely only the "discovery rule".  Rather, Plaintiff's complaint, in addition to pleading discovery rule tolling, pleads equitable tolling.  *Complaint* at 60-65.  PTR fails to mention, much less rebut, Plaintiff's contentions regarding the applicability of these equitable tolling doctrines.

Moreover, although the case law is admittedly not unanimous, the weight of authority, including two Circuit Courts, have held that the discovery rule applies to FDCPA actions.  See discussion *infra*, citing, *inter alia*, *Lembach v. Bierman*, 528 Fed. Appx. 297, 301-302, 2013 U.S.

9

App. LEXIS 12094, 7-9, 2013 WL 2501752 (4th Cir. Md. 2013); *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 939 n.5 (9th Cir. 2009).

Indeed, even those district court cases holding the opposite, relied upon by PTR, are easily distinguishable as they involve situations in which the effect was merely to shorten a consumer's time to file an FDCPA action by a few days or weeks, not – as here – to eliminate the availability of relief entirely.

Moreover, the cases finding the discovery rule inapplicable have involved collection letters as opposed to wrongful initiation of state court actions and their own reasoning suggests that whatever limitations may exist with regard to the discovery rule, do not apply in the case of the latter.  See discussion, *infra*, discussing *Maloy v. Phillips*, 64 F.3d 607, 608 (11th Cir. 1995) and comparing *Serna v. Law Office of Joseph Onwute, P.C.*, 732 F.3d 440, 443 (5th Cir. 2013), and *Johnson v. Riddle*, 305 F.3d 1107, 1113-1114 (10th Cir. 2002).

### 1.  *Plaintiff Is Entitled To Equitable Tolling*

As set forth above, Plaintiff has alleged, in addition, to "discovery rule" tolling, that she is entitled to equitable tolling.

The discovery rule merely stands for the proposition that "the statute of limitations for a particular claim does not accrue until that claim is discovered, or could have been discovered with reasonable diligence, by the plaintiff".  *SEC v. Gabelli*, 653 F.3d 49, 59 (2d Cir. 2011) *rev'd on other grounds*, 133 S. Ct. 1216, 1221 (2013).[2]

Independent of the availability of discovery rule tolling, equitable tolling tolls a statute of limitations where a plaintiff shows:

---

[2] The Second Circuit's decision in *Gabelli* was reversed on grounds that the discovery rule was available to private claimants, but not the "Government bringing an enforcement action for civil penalties."  *Gabelli v. SEC*, 133 S. Ct. 1216, 1221 (U.S. 2013).

> (1)    that the defendant concealed from [the plaintiff] the existence of his cause of action;
>
> (2)    that [plaintiff] remained ignorant of that cause of action until some point within [the applicable statute of limitations for] the commencement of his action; and
>
> (3)    that his continuing ignorance was not attributable to a lack of diligence on his part.

*New York v. Hendrickson Bros, Inc.,* 840 F.2d 1065, 1083 (2d Cir. 1988); *Holmberg v. Armbect*, 327 U.S. 392, 397 (1946) (holding that the doctrine of fraudulent concealment tolls the statute of limitations whenever a plaintiff "has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part."); *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014) ("The distinction between equitable tolling and the diligence-discovery rule has not always been clear in our caselaw. . .  The distinction is that the diligence-discovery rule delays the date of accrual where the plaintiff 'is blamelessly ignorant of the existence or cause of his injury,' while the doctrine of equitable tolling applies after the claim has already accrued, suspending the statute of limitations "to prevent unfairness to a diligent plaintiff[.]") (citations omitted); *Gabelli*, 653 F. 3d at 59 (2d Cir. 2011) (noting "the all-too-common mistake by which the discovery rule is 'sometimes confused with the concept of fraudulent concealment of a cause of action,'") (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002).[3]

"The equitable doctrine [of fraudulent concealment] is read into every federal statute of limitation."  *Holmberg,* 66 S. Ct. at 585.

Unsurprisingly, where the plaintiff has not been apprised of sufficient facts to be on notice of the claim, no inquiry is made into plaintiff's diligence. *Sykes*, 757 F. Supp. 2d at 422

---

[3] In reversing the Second Circuit's determination that the discovery rule was available not only to individual claimants but also to the SEC in civil enforcement actions, the Supreme Court noted that the portions of the Second Circuit's decision distinguishing discovery rule tolling from other forms of equitable tolling were not before it. *Gabelli v. SEC*, 133 S. Ct. at 1220, n.2.

11

(no specific diligence was required of Plaintiffs who were kept from knowledge of default judgments by the inherently self-concealing nature of Defendant's violations);  *Coble v. Cohen & Slamowitz, LLP*, 824 F. Supp. 2d 568, 572 (S.D.N.Y. 2011) (applying equitable tolling in case involving lack of service, and rejecting contention that consumers should be faulted for "inquir[ing] into whether any default judgments had been entered against them" on grounds that "[t]his argument does not reflect the practices of a reasonably diligent consumer.") (J. Briccetti).[4]

Mrs. Aglonu's amended complaint explicitly states that her lack of knowledge regarding the (utterly frivolous) lawsuit filed against her was due of PTR's failure to serve her with the state court summons and complaint or otherwise notify her, as well as its submission to the state court of falsely sworn documents stating the contrary.  For example, the Complaint states, in the section titled, "Equitable Tolling", as follows:

> 60.  Plaintiffs' claims should be tolled because Defendants' by failing to serve Ms. Aglonu in the in the State Court Action, concealed from her and kept her ignorant of the misconduct alleged herein until over a year had passed.

> 61. This concealment was made possible by the submission of false affidavits of service to the State Court which alleged that she had been served when she had not been served, and contained fictitious descriptions of her apartment (describing it as a "place of business"), fictitious descriptions of an (imaginary) co-co-occupant who was purported to have accepted service on her behalf, and fictitious descriptions of conversations between the process server and said imaginary co-tenant.

> 62. This concealement was also made possible by submission to the State Court of a false attorney affirmation by Defendant Peter T. Roach & Associates, P.C., stating that Ms. Aglonu's time to answer had run when, in fact she had not been served and her time to answer had consequently not yet started to run.

> 63. Ms. Aglonu had no reason to know she had been sued in the State Court action, and – as set forth above – through no lack of diligence on her part, only learned of the lawsuit in November 2013.

> 64. She brought the instant lawsuit within one year of learning of the existence of the State Court Action.

---

[4] The undersigned was counsel for plaintiffs in *Coble*.

65.   Under these circumstances, failure to apply equitable tolling would lead to a perverse result in which Defendants' own failure to properly serve Ms. Aglonu in the State Court Action immunized Defendants from liability for state court collection misconduct that is otherwise actionable under the FDCPA.

*Complaint* at 60-65.

Mrs. Aglonu is also entitled to equitable tolling "because Defendants failed to serve her with the State Court Summons and Complaint (or otherwise notify her of the State Court Action) and then submitted and had others submit on their behalf documents falsely stating that service had been made, said documents containing numerous related false statements regarding the details of service" and because "regardless of any actual misrepresentations made, Defendants had a legal and professional ethical obligation to notify her of the filing of the State Court action and the other facts underlying her claims, and failed to do so." *Complaint* at 66-68.[5]

Thus, Plaintiff's allegations fall well within the parameters of this Circuit's equitable tolling doctrine.  Notably, PTR does not claim otherwise.

Indeed, Courts have regularly applied equitable tolling to FDCPA claims, particularly where the claim stemmed from state court litigation misconduct and the consumer alleged she was not served.  *See, e.g.*, *Sykes v. Mel Harris and Assoc., LLC*, 757 F. Supp. 2d 413, 422 (S.D.N.Y 2010) (holding that "FDCPA claims are subject to equitable tolling" where claims

---

[5] The above quotations from paragraphs 66-68 of the Complaint are found under the heading "equitable estoppel". There has been significant confusion in the case law regarding which types of equitable circumstances are properly characterized as justifying "equitable estoppel" vs. "fraudulent concealment".  See *Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. N.Y. 2002)  (describing overlapping meanings of these and other terms as used in the case law). The Second Circuit appears, however, to have now settled on a distinction whereby "equitable estoppel" is used to describe situations in which "plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit", as opposed to fraudulent concealment, in which the Defendant's conduct prevents the plaintiff from learning of the cause of action, in the first place.  *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 802 (2d Cir. Dec. 8, 2014) (quotations omitted).  The Court further clarified in *Ellul*, that "this distinction makes the application of equitable tolling and equitable estoppel mutually exclusive, though of course they can be argued in the alternative."  *Id.*, n.18.  Because Mrs. Aglonu was never aware of her cause of action due to Defendants' conduct, "equitable tolling" as the term must now be used is not relevant.  Rather, the allegations found in the Complaint under that heading describe additional valid bases for application of fraudulent concealment tolling.

related to sewer service); *Coble v. Cohen & Slamowitz, LLP*, 824 F. Supp. 2d 568, 571, 2011

U.S. Dist. LEXIS 125874, 8 (S.D.N.Y. 2011) (applying equitable tolling to FDCPA claims

relating to false state court affidavits and affirmations because conduct was self-concealing);

*Foster v. D.B.S. Collection Agency*, 463 F. Supp. 2d 783, 799-800 (S.D. Ohio 2006) (tolling

FDCPA statute of limitations under a fraudulent concealment theory where consumer alleged

that state court lawsuits were wrongly initiated and "Defendants have not proved when any of

the class members discovered or had reasonable opportunity to discover Defendants' alleged

misrepresentations.); *Boyd v. J.E. Robert Co.*, 2008 U.S. Dist. LEXIS 72959, 2008 WL 4415253,

at *2 (E.D.N.Y. Sept. 24, 2008) (holding that equitable tolling was available in FDCPA class

action and allowing plaintiff to re-plead to clearly articulate basis for same); *Vincent v. Money

Store*, 2015 U.S. Dist. LEXIS 12146, n. 4-5, n.9 (S.D.N.Y. Feb. 2, 2015) (noting the split

amongst the Circuits with regard to whether the FDCPA's statute of limitations began to run

upon the mailing or the receipt of a dunning letter; and stating that, although the FDCPA did not

permit application of the discovery rule, equitable tolling remained available).

Indeed, the tolling issue presented in the case at bar is indistinguishable from the one

presented in *Kearney v. Cavalry Portfolio Servs.*, LLC, 2014 U.S. Dist. LEXIS 105577, 2014 WL

3778746 (E.D.N.Y. July 31, 2014), in which the Court found that where the Plaintiffs plausibly

alleged lack of service of the underlying state court complaint, their FDCPA claims were equitably

tolled :

> Plaintiffs Rodriguez and Goldstein allege that they never were served properly in
> the initial suits. Rodriguez claims she first became aware of the underlying suit on
> July 15, 2011, when she was denied housing, whereas Goldstein claims to have
> first received notice through the income execution served on her employer on July
> 22, 2011. The legitimacy of Rodriguez and Goldstein's assertions are supported
> by civil court findings that default judgments were improperly entered against
> both Rodriguez and Goldstein in the underlying state lawsuits against them.
> Bronx Civil Court Judge Lizbeth Gonzalez vacated the default judgment against

Rodriguez on August 3, 2011, and directed Rodriguez to file an answer, which Rodriguez did later the same day.  Goldstein filed an order to show cause why the default judgment should not be vacated for failure to serve, and to dismiss the action on November 17, 2011, which was granted and eventually resulted in the dismissal of CPS's suit. Based on these facts, the Court finds the tolling of the statute of limitations is appropriate as to Rodriguez and Goldstein. Based upon the dates that they first became aware of the underlying suits, Rodriguez and Goldstein's current FDCPA claims fall within the one-year window.

*Id.* at 16-17.

Notably, just as was the case in *Kearney*, Mrs. Aglonu's assertion that she was never served and only found out about the judgment as a result of an income execution was supported by a state court finding vacating the default judgment against her.  *Complaint* at 59.

In short, under the circumstances present here, Aglonu is clearly entitled to equitable tolling, which she has clearly pled.  PTR's motion, which fails to address much less rebut Aglonu's equitable tolling allegations, must fail for this reason alone.

*Id.* at 66-68.

### 2.   *Plaintiff Is Entitled To Discovery Rule Tolling*

Even if one were to somehow disregard Plaintiff's allegations regarding equitable tolling, Plaintiff would nonetheless prevail because, contrary to PTR's contentions, the discovery rule is available under the FDCPA.

The Fourth Circuit recently applied the discovery rule in an FDCPA case involving state court litigation, holding that even where the consumer was served with the summons and complaint, she was entitled to discovery rule tolling regarding falsified affidavits, not docketed until some time later:

We see no reason not to apply the discovery rule to this case. The Lembachs had no way of discovering the alleged violation until they actually saw the fraudulent signatures on the docketing material. Further, BGWW should not be allowed to profit from the statute of limitations when its wrongful acts have been concealed. As the Supreme Court held in *Bailey v. Glover*, 88 U.S. 342, 22 L. Ed. 636 (1875), "where the party injured by the fraud remains in ignorance of it without any fault

15

or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered," *id*. at 348. We hold that the Lembachs' filing was timely because they filed within one year of the time that they discovered (or could have discovered) the fraud.

*Lembach v. Bierman*, 528 Fed. Appx. 297, 301-302 (4th Cir. 2013).

The Ninth Circuit has likewise squarely held that the discovery rule applies under the FDCPA, stating:

We have made it clear that, in general, the discovery rule applies to statutes of limitations in federal litigation, that is, "[f]ederal law determines when the limitations period begins to run, and the general federal rule is that 'a limitations period begins to run when the plaintiff knows or has reason to know of the injury which is the basis of the action.'" *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1266 (9th Cir. 1998) (quoting *Trotter v. Int'l Long-shoremen's & Warehousemen's Union*, 704 F.2d 1141, 1143 (9th Cir. 1983)).

*Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 940, 2009 U.S. App. LEXIS 17281, 9-11 (9th Cir. Idaho 2009); *id*. (distinguishing *TRW Inc. v. Andrews*, 534 U.S. 19, 33, 122 S. Ct. 441, 450, 151 L. Ed. 2d 339 (2001) (which held that the Fair Credit Reporting Act was not subject to a general discovery rule where Congress stated in the text of the statute itself that willful representation was required in order to depart from the FCRA's two year statute of limitation)).

More recently, the 9th Circuit reiterated this ruling in an FDCPA case involving state court collection litigation, stating:

The district court appropriately concluded that "the first time that [Tourgeman] reasonably could have become aware of the allegedly false and misleading representations in Defendants' letters was when his father was served with summons and complaint in the state court lawsuit in October 2007," after which litigation discovery revealed the existence of the collection letters.

*Tourgeman*, 2011 U.S. Dist. LEXIS 81070, 2011 WL 3176453, at *6; *Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 327 (7th Cir. 2000) (holding that the FDCPA's statute of limitations was not jurisdictional).

16

PTR ignores these circuit decisions, and relies instead on *Benzemann v. Citibank N.A*, 2014 U.S. Dist. LEXIS 88030, 2014 WL 2933140, at *6 (S.D.N.Y. June 27, 2014).  In *Benzemann*, a consumer claimed that a garnishment notice sent by the debt collection law firm to the bank contained false statements.  Although the statement had been sent by the collector to the bank on December 6, 2011, the consumer did not learn of it until 8 days later on December 14, 2011, when his account was frozen by the bank.  He brought claims under the FDCPA one year later on December 14, 2012.  The Court held that the consumer had waited too long, and that the statute of limitations started to run when the letter was sent on December 6th.

In doing so, the Court reasoned that this was consistent with the FDCPA's purpose because "in construing the FDCPA's provisions, the relevant actions are those of the debt collector -- the party whose conduct the FDCPA was intended to regulate -- rather than those of the debtor."

Whatever the merits of this logic as applied to a situation such as presented in *Benzemann*, where the debate was between the consumer having 12 months vs. 11 months and three weeks to file suit, it can hardly be claimed that the FDCPA's remedial purpose is advanced by eliminating the consumer's time to file suit entirely, particularly where the reason that the consumer did not learn of the debt collector's violative state court conduct earlier is the debt collector's failure to serve the consumer in the state court action prior to taking a default judgment.  Indeed, there is no reason to think the Court – concerned as it was with the purpose of the FDCPA – would have adopted the same position regarding the discovery rule on the facts present in the case at bar.

Indeed, even as applied to collection letters *Benzemann*'s assertion that the FDCPA's purpose justifies focus on the mailing of a collection notice by the debt collector rather than receipt

by the consumer has been rejected by the Second Circuit.  Specifically, in *Bates v. C & S Adjusters, Inc.*, 980 F.2d 865 (2d Cir. 1992), the Court stated:

> In adopting this statute, Congress was concerned about the harmful effect of abusive debt collection practices on consumers. See 15 U.S.C. § 1692(a) ("Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy.*"). This harm does not occur until receipt of the collection notice. Indeed, if the notice were lost in the mail, it is unlikely that a violation of the Act would have occurred.*

*Id.* at 868.[6]

And although the Court need not reach this issue, Plaintiff respectfully submits that

*Benzemann* is incorrect even as applied to the facts presented in that case, as it analysis hinges to

a large degree on an overly broad reading of *TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (U.S.

2001).  In *TRW*, the Supreme Court held that the Fair Credit Reporting Act was not subject to the

discovery rule reasoning as follows:

> Congress provided in the FCRA that the two-year statute of limitations runs from "the date on which the liability arises," subject to a single exception for cases involving a defendant's willful misrepresentation of material information. § 1681p. The most natural reading of § 1681p is that Congress implicitly excluded a general discovery rule by explicitly including a more limited one. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) ("Expressio unius est exclusio alterius."). We would distort § 1681p's text by converting the exception into the rule. Cf. *United States v. Brockamp*, 519 U.S. 347, 352, 136 L. Ed. 2d 818, 117 S. Ct. 849 (1997) ("explicit listing of exceptions" to running of limitations period considered indicative of Congress' intent to preclude "courts [from] reading other unmentioned, open-ended, 'equitable' exceptions into the statute").

---

[6] The Court continued in a footnote as follows:

> Although we need not decide the issue today, we note that at least one court has indicated that a plaintiffs cause of action might not accrue until receipt of the collection notice for purposes of the Act's one-year statute of limitations, 15 U.S.C. § 1692k(d) (1988). See *Seabrook v. Onondaga Bureau of Medical Economics Inc.*, 705 F. Supp. 81, 83 (N.D.N.Y. 1989) ("more likely" that statute would start to run only "on the date the debtor received the communication"). But see *Mattson v. U.S. West Communications, Inc.*, 967 F.2d 259, 261 (8th Cir. 1992) (statute starts to run on date of mailing); *Drumright v. Collection Recovery, Inc.*, 500 F. Supp. 1 (M.D. Tenn. 1980) (statute starts to run on date of mailing for some violations).

*Bates*, 980 F.2d at 868 (2d Cir. 1992)

> At least equally telling, incorporating a general discovery rule into § 1681p would not merely supplement the explicit exception contrary to Congress' apparent intent; it would in practical effect render that exception entirely superfluous in all but the most unusual circumstances.

*TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (U.S. 2001).

In the context of the FDCPA, none of these considerations applies because – unlike the FDCRA -- the FDCPA's statutory text contains no exception to the generally applicable statute of limitations that would be rendered "entirely superfluous" by application of generally applicable tolling doctrines such as the discovery rule. As such, the assertion that the express language of the FDCPA bars application of the discovery rule fails. See *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 940-1 (9th Cir. 2009) (discussing *TRW* and its application to the FDCPA at length and distinguishing it on these grounds); *Lembach*, 528 Fed. Appx. at 302 (finding application of the discovery rule to the FDCPA consistent with *TRW*).

Nor is it clear that the two Circuit decisions relied upon *Benzemann* (*i.e.*, *Maloy v. Phillips*, 64 F.3d 607, 608 (11th Cir. 1995) and *Mattson v. U.S. West Communications, Inc.*, 967 F.2d 259, 261 (8th Cir.1992)) support non-application of a discovery rule in cases involving state court collection misconduct, as opposed to collection letters.

*Maloy* adopted *Mattson* with regard to using the date collection letters were sent for tolling purposes, and described *Mattson* as follows:

> In *Mattson*, the debt collector mailed a collection letter dated November 27, 1989, and the debtor filed her action on November 27, 1990. The Eighth Circuit affirmed the dismissal of the action, reasoning that the statute of limitations began to run on the date the letter was mailed *because that was the debt collector's last opportunity to comply with the FDCPA*. In addition, the court concluded that using the date of mailing was a better and more practical approach because it provided a date that was easy to determine, ascertainable by both parties, and easily applied.

19

> We find the reasoning of the Eighth Circuit persuasive and adopt the approach
> used in *Mattson[.]*

*Maloy,* 64 F.3d at 608 (emphasis added).

This reasoning, whatever its merits as applied to mailing out collection letters, does not

apply with the same force to a state court complaint.  Rather, as the Tenth Circuit noted in

*Johnson, 305 F.3d 1107.*

> If the debt collector files suit against the FDCPA plaintiff but then elects to call
> off the process server and abandon the collection suit before the plaintiff has been
> served, it cannot be said that the abandoned lawsuit constitutes an "attempt to
> collect" on the debt within the meaning of the FDCPA, 15 U.S.C. § 1692f. . . . Of
> course, the fact that a party that has committed half an actionable wrong is likely
> to commit the other half cannot suffice to create a complete and present cause of
> action.

*Id. at 1113-1114.*[7]

Because the filing of a complaint, unlike the sending of a letter is not the "debt collectors last

opportunity to comply with the FDCPA", *Benzemann*'s ruling regard collection letters and the

case law it relied upon are simply inapposite.

---

[7] Similarly in *Serna v. Law Office of Joseph Onwute, P.C.*, 732 F.3d 440 (5th Cir. 2013), the Fifth Circuit held that
where consumer's FDCPA claim was based on wrongful filing of state court action in distant forum the statute of
limitations did not begin to run until the collector served the complaint, reasoning as follows:

> [W]e are guided by the principle that a claim does not accrue for purposes of a statute of
> limitations until a plaintiff experiences an actual injury. When a defendant's wrongful act does not
> coincide with the plaintiff's injury, the statute of limitations does not begin to run until the plaintiff
> is harmed. Frame, 657 F.3d at 238 (explaining that a plaintiff's disability claim accrued not when
> the defendant built an inaccessible sidewalk, but when the plaintiff became disabled and
> encountered the harm of not being able to use the sidewalk); Here, an alleged debtor does not
> suffer any injury until he becomes aware of a debt-collection suit and is forced to respond in a
> distant forum. Therefore, our holding that a debt collector does not violate § 1692i(a)(2) until the
> debtor receives notice of the debt-collection suit aligns with our well-settled precedent establishing
> that for purposes of a statute of limitations a claim does not accrue until the plaintiff suffers actual
> injury.

*Id*. at 445-446 (citations omitted).

In sum, Plaintiff's claims against PTR are timely under both an equitable tolling theory and pursuant to the discovery rule, and even without reference to tolling rules, based on analysis of when the action accrued.

### B. PTR's Extrinsic Evidence Cannot Be Considered At This Stage Of The Litigation, Is Not In Admissible Form, And Is, In Any Event, Contested

In a single paragraph at the end of its brief, PTR contends that the action is also time-barred based on a collection letter dated November 28, 2011 ("2011 Letter") that PTR purports to have sent Plaintiff.  Arguing that this letter demonstrates that "Plaintiff had knowledge of the State Court Action and judgment therein as early as December 2011."  *PTR MOL* at 6.

The 2011 Letter is extrinsic evidence that cannot be considered at the 12(b)(6) stage and even where the court to somehow consider it, must be disregarded as being in inadmissible form.  In any event, the letter and its receipt are flatly contradicted by the Complaint and by Mrs. Aglonu's affidavit testimony submitted herein.

### 1. *PTR's Extrinsic Evidence Cannot Be Considered At The 12(b)(6) Stage*

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein; *Goldberg v. Danaher*, 599 F.3d 18, 183 (2d Cir. 2010); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *U1it4less, Inc. v. Fedex Corp.*, 2012 U.S. Dist. LEXIS 138810 (S.D.N.Y. Sept. 25, 2012).

There are extremely limited exceptions to Rule 12(b)(6)'s general prohibition against considering materials outside the four corners of the complaint, which one District Court in the S.D.N.Y. cogently outlined as follows:

> [I]f extrinsic evidence submitted on a motion to dismiss is deemed part of the pleadings, it may be considered in deciding the motion. See *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, at *13 (S.D.N.Y. Jan. 26, 2010).

21

Pleadings include not just the four corners of the complaint, but also "'any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (same); see also Fed. R. Civ. P. 10(c). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers*, 282 F.3d at 153 (quoting *Int'l Audiotext*, 62 F.3d at 72). Therefore, extrinsic documents may be considered as part of the pleadings if they either are (1) attached to the complaint; (2) incorporated into the complaint by reference; or (3) integral to the complaint... To be incorporated by reference, the complaint must make "a clear, definite and substantial reference to the documents." *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003); see also *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 167 (S.D.N.Y. 1995). "[L]imited quotation" of documents not attached to the complaint "does not constitute incorporation by reference." *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985); see also *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 299 n.39 (S.D.N.Y. 2008). To be integral to a complaint, the plaintiff must have (1) "actual notice" of the extraneous information and (2) "'relied upon th[e] documents in framing the complaint.'" *Chambers*, 282 F.3d at 153 (quoting *Cortec*, 949 F.2d at 48). "[M]ere notice or possession is not enough" for a court to treat an extraneous document as integral to a complaint; the complaint must "'rel[y] heavily upon [the document's] terms and effect'" for that document to be integral. Id. (quoting Int'l Audiotext, 62 F.3d at 72).  Even if a document meets the twin requirements of integrality-reliance and notice-a court still may not consider it on a motion to dismiss if there is a dispute "regarding the authenticity or accuracy of the document" or "the relevance of the document" to the dispute. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

*Deluca v. AccessIT Group, Inc.*, 695 F. Supp. 2d 54, 59-60 (S.D.N.Y. 2010); *Allen v. Chanel Inc.*, 2013 U.S. Dist. LEXIS 78642, 15, 2013 WL 2413068 (S.D.N.Y. June 4, 2013) ("For incorporation by reference, a complaint 'must make a clear, definite, and substantial reference' to the documents. 'A mere passing reference or even references, however, to a document outside of the complaint, does not, on its own' suffice to incorporate it.") (citations omitted).

Judged by this standard, the documents submitted by PTR are clearly extrinsic evidence that are not part of the pleadings and may not be considered.

To wit: the 2011 Letter was not attached to the Amended (or Initial) Complaint.  Nor was the letter incorporated by reference, as it was not quoted from in whole or in part in the Complaint.

*Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985); *Sira v. Morton*, 380 F.3d 57, 67-68 (2d Cir. N.Y. 2004).  Nor is the document "integral to the complaint", *i.e.*, its "terms and effect" are not "relie[d]  heavily upon."   *Chambers*, 282 F.3d at 153.

Indeed, its existence is counter-indicated in the complaint, with Ms. Aglonu alleging that she never received any such letter.

Even were this not so, the letter would not be properly considered because Ms. Aglonu alleges that she did not have "actual notice" of any such letter, and because there is a dispute between the parties as to its authenticity.  *Faulkner*, 463 F.3d at 134.

In sum, the issues surrounding the document, *i.e.*, its  authenticity, the true date of its creation, when, if ever, it was sent by Defendant; when if ever it was received by Plaintiff, etc. are classic fact questions not amenable to treatment on a motion to dismiss.  See *Musah v. Houslanger & Assocs., PLLC*, 962 F. Supp. 2d 636, 639 (S.D.N.Y. 2013) ("Musah II") (holding in an FDCPA that where, as here, a debt collection law firm claimed to have sent consumer a letter and the consumer's complaint alleged that no such letter was received, a factual dispute existed and the case was ""inappropriate for resolution on a motion to dismiss".)[8]

Finally, it is important to note in this regard that PTR has not stated any desire to convert its motion to one for summary judgment, e.g. pursuant to Fed. R. Civ. P. 12(d) nor complied with any of the requirements specific to such motions pursuant to Fed. R. Civ. P. 56.

2.   *The 2011 Letter Is Not In Admissible Form.*

In order to be admissible, the 2011 Letter must qualify as a business record.  Fed. R. Evid. 902(11); 803(6):

> To lay a proper foundation for a business record, a custodian or other qualified
> witness must testify that the document was "'kept in the course of a regularly
> conducted business activity and also that it was the regular practice of that

[8] The undersigned was counsel for Plaintiff in the *Musah* litigation.

business activity to make the [record].'" *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (quoting *United States v. Freidin*, 849 F.2d 716, 719-20 (2d Cir. 1988) . . . *In re Ollag Constr. Equip. Corp*., 665 F.2d 43, 46 (2d Cir. 1981) (finding that "business records are admissible if witnesses testify that the records are integrated into a company's records and relied upon in its day-to-day operations," and noting that the relevant financial statements were requested by a bank and were regularly used by the bank to make decisions whether to extend credit).

*United States v. Komasa*, 767 F.3d 151, 156, 2014 U.S. App. LEXIS 16672, 12-13 (2d Cir. 2014).

Judged by this standard, the affidavit of Peter T. Roach Esq., to which the 2011 Letter is attached (ECF Doc. 14) ("Roach Aff.") is grossly deficient.

The Roach Affidavit is silent on whether the attached letter is a printout of an electronically stored image of the purported original (i.e. ESI) or merely a paper copy of the paper original.  In either case, the affidavit is silent on the issues relevant to authentication.  For example:  the affidavit does not contain even a conclusory statement regarding whether the document at issue was kept in the course of a regularly conducted business activity, nor whether these documents are integrated into PTR's company records, nor whether PTR relies upon these documents in its day-to-day operations.

Of course, if the 2011 Letter is an electronically stored document, the deficiencies are even more notable, as the affidavit is silent on all aspects of PTR's digital record storage system.

Indeed, Roach does not claim to be a custodian of records, nor to have personal knowledge of the sending of the letter.  Rather, he merely claims that he is a defendant in this action and a member of PTR and "as such" is "fully familiar with the facts and circumstances set forth" in the affidavit.

Particularly given that Mr. Roach runs a high volume firm that, according to eCourts (the NYS Unified Court System case information online database), filed over 4,500 lawsuits in New

24

York's civil courts, as well as several hundred more in New York's state supreme courts in 2011 (the year that Mrs. Aglonu was sued), and given that the purported July 2011 appears to be a boilerplate, unsigned, post-judgment form, it is inconceivable that he has any personal recollection of this individual letter or the circumstances surrounding it's production and sending.  Nor does he claim to be qualified to testify regarding how these types of letters are generated, stored or sent, much less point to any proof of mailing.

   In short, we know nothing about how this document was generated or how it was created, maintained, preserved (or tampered with), sent, etc., nor does Mr. Roach even claim to have knowledge of these topics.

   3.   *PTR's Allegations Regarding The November 2011 Letter Are Contested*

   In the event that the Court converts PTR's motion to dismiss to one for summary judgment, *sua sponte*, it is also important to note that there is, at a minimum, a material dispute regarding Plaintiff's receipt of the purported November 2011 Letter.

   Specifically, the Affidavit of Rokayia Aglonu, submitted herewith ("Aglonu Aff."), rebuts all of PTR's material factual allegations regarding the November 2011 Letter, stating unequivocally:  (1) that she has reviewed the November 2011 Letter in connection with this motion, and did not receive it "in any form or by any method of delivery" (*id.* at 16-17); (2) noting that the purported letter misspells her first name, gets her last name wrong, and reverses her apartment number, and that this may well explain why the letter was never delivered (*id.,* at 18-19, stating, *inter alia*,  "to wit, my first name is 'Rokayia', not 'Rokayi'; my last name is 'Aglonu', not 'Wahab', and I live in apartment 'A-62', not '62A'); (3) noting that she is careful with her finances and does "not ignore bills or throw them out without first paying or otherwise resolving them"); and (4) that she has a specific place where she keeps bills, and that she

conducted a search of her files after learning of the state court action against her in late 2013 and confirmed that she had not received any prior communication from Defendants or WMC relating to the state court action (*id*. at 23-24).[9]

In sum, the only reliable evidence regarding the purported November 2011 Letter indicates that Mrs. Aglonu never received it.

### C. Defendant SEA's Motion Likewise Fails

SEA raises multiple defenses, all of which fail:

i.   SEA argues that Plaintiff's claim regarding failure to include the statutorily required language in its initial written communication with her in November 2013 fails because SEA purportedly sent a prior letter to Ms. Aglonu in July 2013 (the "July 2013 Letter"). This argument fails because the July 2013 is extrinsic evidence that cannot be considered at the 12(b)(6) stage; because the letter is not submitted in inadmissible form, and because there are disputed issues of material fact regarding whether the letter is authentic and was in fact ever sent.

ii.  SEA next argues that it cannot be held liable because there was nothing deceptive or otherwise unlawful regarding the November 2013 letter sent by it debt collector, Raymond Goodsen. This argument misconstrues Plaintiff's complaint. Plaintiff alleges that the November 2013 letter demonstrates that at the time it was sent SEA knew that the all of the relevant factual submissions to the state court, which were the basis for the judgment obtained against Mrs. Aglonu, were false. SEA violated the FDCPA, *inter alia*, because

---

[9] By submission of this affidavit, Plaintiff does not concede the propriety of PTR's submission of extraneous material, nor concede that PTR's motion is appropriately converted to one for summary judgment. Rather, Plaintiff submits the Aglonu Affidavit to preserve her rights and because the other Defendant in this action, SEA has – unlike PTR – moved to convert its motion to one for summary judgment, making the submission of a rebutting affidavit prudent.

despite this knowledge, and without notifying either the state court or defendant that the judgment was infirm, SEA continued to press Aglonu for payment, inter alia, by garnishing her wages. Indeed, the November 2013 letter failed even to inform Mrs. Aglonu that a judgment had been taken against her.

iii. Finally, SEA argues that any actions it took with regard to post judgment collection were legal because the judgment was "duly entered" and SEA was "entitled to rely of the force and effect of the judgment when seeking to collect or enforce the judgment pursuant to the laws of the State of New York." *SEA Opp.* at 11. As set forth below, where – as here – a collection attorney becomes aware that a judgment was obtained by fraud on the court, Courts in this District have repeatedly rejected SEA's position.

As an initial matter, however, and before addressing the substance of SEA's arguments, it is important to review the reasons why SEA's request to convert the instant action to one for summary judgment should be denied under applicable precedent.[10]

1. *12(b)(6) Motion Should Not Be Transformed Into A Motion For Summary Judgment Because There Has Been No Discovery And The Record Is Undeveloped*

SEA's motion, unlike PTR's, recognizes that extrinsic evidence may not be considered at the 12(b)(6) stage and therefore requests that the motion be converted into one for summary judgment pursuant to Fed. R. Civ. P. 12(d).

---

[10] Plaintiff also notes that SEA's motion was untimely. Pursuant to the explicit instructions set forth in this Court's Order dated December 23, 2014, SEA's time to move to dismiss the Amended Complaint was governed by the Federal Rules of Civil Procedure ("The amended complaint shall be filed by 1/12/2015. . . .If the moving defendant chooses to file an answer to or motion to dismiss the amended complaint, the time to do so shall be governed by the Federal Rules of Civil Procedure, unless otherwise ordered by the Court."). *ECF Doc. 9*. Pursuant to the Court's Order, Plaintiff filed her Amended Complaint on January 12, 2015. Pursuant to Fed. R. Civ. P. 12(b), SEA was required to file its motion within 21 days, *i.e.* prior to the expiration of SEA's time to Answer. Thus, SEA's deadline to file was February 2, 2015. As such, SEA's motion is properly considered as a motion for judgment on the pleadings pursuant to Rule 12(c), which is judged under an identical standard as a motion made pursuant to Rule 12(b)(6). *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 2001 U.S. App. LEXIS 17332, 50 Fed. Serv. 3d (Callaghan) 232 (2d Cir. Conn. 2001).

When a party present extraneous materials as part of a Rule 12(b)(6) motion or in opposition thereto, the Court has discretion to either exclude the extraneous materials or accept the extraneous material and convert the motion to one for summary judgment. *Allen v. Chanel Inc.*, 2013 U.S. Dist. LEXIS 78642, 13-14, 2013 WL 2413068 (S.D.N.Y. June 4, 2013).

However, numerous Court have recognized, that where, as here, Plaintiff has not had the opportunity to complete discovery, and "it is not likely that sufficient evidence can be garnered at this juncture", the attempt to convert the motion into one for summary judgment is properly denied. As the Court summarized in *Lorber v. Winston*, 962 F. Supp. 2d 419 (E.D.N.Y. 2013):

> '[T]he Court declines to convert this motion to dismiss into one for summary judgment because," at the time the Defendants' motions were filed, "[the] Plaintiff[ ] ha[d] not [yet] had the opportunity to conduct discovery." *Snyder v. Fantasy Interactive, Inc.*, No. 11 Civ. 3593(WHP), 2012 U.S. Dist. LEXIS 23087 (S.D.N.Y. Feb. 9, 2012) (citations omitted). Indeed, "[d]iscovery is ongoing in this matter and it is not likely that sufficient evidence can be garnered at this juncture to properly consider a motion for summary judgment." *Krapf v. Prof'l Collection Servs., Inc.*, 525 F. Supp. 2d 324, 326 (E.D.N.Y. 2007). Therefore, since the 2007 documents are outside the pleadings, this Court will not consider them at this stage, as such evidence is inappropriate for consideration on a 12(b)(6) motion to dismiss. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 113 (2d Cir. 2010) (citation and internal question marks omitted)

*Id.* at 442; See *Krapf*, 525 F. Supp. at 326 (denying a motion to convert pursuant to Fed. R. Civ. P. 12(d) in the FDCPA context); *Brodeur v. City of New York*, 2002 U.S. Dist. LEXIS 4500, 7, 2002 WL 424688 (S.D.N.Y. Mar. 18, 2002).

Here, Plaintiff has likewise "not yet had the opportunity to conduct discovery".  And unlike the typical case in which the motion to convert is deemed appropriate, the extrinsic documents at issue are not agreements which all parties concede were signed by Plaintiff or the like.  Indeed, Plaintiff challenges the authenticity of the purported July 2013 letter and denies having ever received it.  *Compare*, *Russomanno v. Murphy*, 2011 U.S. Dist. LEXIS 17248, 10-11, 2011 WL 609878 (S.D.N.Y. Feb. 16, 2011) (converting a motion to dismiss to one for summary judgment

where there was no dispute regarding a release signed by plaintiff that would bar her claims other than whether it was legally valid and enforceable).

The record remains profoundly undeveloped: there has been no discovery regarding the authenticity of the document (of which there are currently no indices); there is no evidence the letter was sent; and the only evidence regarding whether Mrs. Aglonu received the letter is her testimony that she did not. *Aglonu Aff.* at 16-24.

For these reasons, the Court should decline to convert SEA's motion into one for summary judgment, and disregard the extraneous documents SEA has submitted as outside the four corners of Plaintiff's complaint and therefore not properly considered under Fed. R. Civ. P. 12(b)(6).

> 2. *SEA's Extrinsic Evidence, Including the November 2013 Letter, Should Be Rejected As Inadmissible*

As noted above, SEA argues that Plaintiff's 1692g claim fails because the admittedly non-compliant November 2013 letter was preceded by a purportedly compliant July 2013 Letter.

Even were the Court to convert SEA's motion to one for summary judgment, as SEA requests, the motion would fail because, as with PTR's November 2011 letter, the purported July 2013 upon which SEA principally relies is not submitted in inadmissible form. To wit, as reviewed above with regard to PTR's motion, in order "to lay a proper foundation for a business record, a custodian or other qualified witness must testify that the document was 'kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the [record].'" *Komasa*, 767 F.3d at 156 (quoting *Williams*, 205 F.3d at 34) (discussed *supra*).

SEA provides no such affidavit testimony. Rather, SEA attached the July 2013 letter to the Affidavit of Stephen Einstein, who alleges every fact set forth in the affidavit "on my personal knowledge *and information and belief*" and alleges on the same basis that "the

referenced exhibits are true and accurate copies of business records kept in the regular course of business [.]" *Einstein Aff.* at p. 1.

This entirely conclusory assertion fails, on its face, to qualify the records in question.  In addition to the fact that there is no testimony documenting that it was "the regular practice of that business activity to make" the July 2013 letter, the affidavit is insufficient because it is unclear whether any particular factual assertion or exhibit is being presented merely "on information and belief".

Indeed, given the extreme unlikelihood that Mr. Einstein – whose firm, according to eCourts, filed over 2600 collection lawsuits in 2013 in New York, the year of the letter in question -- has any personal knowledge about the unsigned, boilerplate form allegedly sent to Mrs. Aglonu, and given that he does not claim to be a custodian of records, it would appear far more likely that he is testifying on information and belief.

On summary judgment, affidavits resting on information and belief and presented without – as here – "without supporting evidentiary facts", do not comply with Fed. R. Civ. P. 56(e), and are thus insufficient as a matter of law. *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995); *Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 831; 70 S. Ct. 894 (1950) (affidavit in support of motion for summary judgment made on information and belief does not comport with Rule 56(e)) (overruled on other grounds).

For these reasons, even were the Court to convert SEA's motion, the evidence submitted is inadmissible.

### 3. *Disputed Issues Of Material Fact Abound*

Moreover, even where it to be deemed admissible, there are genuine dispute of material fact regarding the July 2013 Letter as well as the rest of SEA's allegations regarding Mrs. Aglonu's interactions with SEA.

a.  *The Standard On Summary Judgment*

"When a motion for summary judgment is made…the adverse party's response…must set forth specific facts showing that there is a genuine issue for trial [otherwise] summary judgment, if appropriate, shall be entered against the adverse party."  Fed. R. Civ. P. 56(e).  In evaluating a motion for summary judgment, a court must resolve all ambiguities, and draw all inferences, against the moving party.  *Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir. 1994). Therefore, to defeat summary judgment, the non-moving party must present evidence that would allow "a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Furthermore, a district court "should not weigh evidence or assess the credibility of witnesses" in reviewing a motion for summary judgment. *Hayes v. New York City Department of Corrections*, 84 F. 3d 614, 619 (2nd Cir. 1996).

b.  *Disputes Of Material Fact Regarding The Purported July 2013 Letter And Mrs. Aglonu's Interactions With SEA*

Not only does the Complaint alleges that Mrs. Aglonu did not receive any such letter, but – on the possibility that SEA's motion to convert pursuant to Rule 12(d) is granted over Plaintiff's objection – Plaintiff has submitted herewith a sworn affidavit confirming in greater detail that she never received any such letter.  *Aglonu Aff.* at 16-24.[11]

---

[11] Mrs. Aglonu's affidavit states, inter alia, as follows:

    16.    In connection with the filing of the instant opposition papers, my lawyers recently showed me a document labeled ECF Doc. 14-3, which purports be a "Notice To Judgment Debtor Or Obligor", dated November 28, 2011 from Peter T. Roach & Associates, P.C. and addressed to:

Rokayi Wahab [sic]

58 South 2nd Av Apt 62A [sic]

Mount Vernon, NY 10550.

    17.    I did not receive this notice in any form or by any method of delivery.

    18.    I note in this regard, that the addressee information in the letter contains several errors that may have caused it not to be delivered.

    19.    To wit:  my first name is "Rokayia", not "Rokayi"; my last name is "Aglonu", not "Wahab"; and I live in apartment "A-62", not "62A".

    20.    Likewise, in connection with opposing Defendants' motions, my lawyers have shown me a document labeled ECF Doc. 18-4, which purports be a collection letter, dated July 13, 2013, from

In this regard, Ms. Aglonu notes that SEA's purported July 2013 letter, like PTR's purported November 2011 letter suffer from a variety of defects that, cumulatively, make non-delivery especially plausible, *i.e.*, the misspelling of her first name, the use of "Wahab", which she has never taken or used, in lieu of her correct last name, and the mislabeling of her apartment as "62A" instead of "A-62".  *Id*.[12]

In this regard, it is notable that a state court judge has already heard her testimony regarding receipt of the Summons and Complaint also purported by Defendants herein to have been served upon her, and found her credible.  *State Court Order*, dated December 9, 2014 (vacating state court judgment and dismissing state court action against Mrs. Agluno for lack of service) attached hereto as *Exhibit A* to Declaration of Daniel A. Schlanger, Esq., dated March 4, 2015 ("Schlanger Decl.").

Likewise, SEA debt collector Raymond Goodsen amazingly claims in his affidavit, without reference to any file notes, collection log, audio recordings or the like, to recollect "on [his] own personal knowledge and information and belief" that he called Mrs. Aglonu on July 26, 2013 and that during this call she "acknowledged receipt of a July 18, 2014 letter from the firm".  This, too, is expressly denied by Mrs. Aglonu, who provides a detailed account of her conversations with

---

Stephen Einstein & Associates, P.C. and which contains all of the save errors, being addressed, again, to:

Rokayi Wahab [sic]
58 South 2Nd Av Apt 62A [sic]
Mount Vernon, NY 10550-3418.

21.  Again, this letter -- which I never received -- contains errors with regard to my first name, my last name and my apartment number that may have prevented its delivery.
22.  I am careful and prudent with my finances, and do not ignore bills or throw them out without first paying or otherwise resolving them.
23.  I have a specific place in my apartment, that is, a shelf alongside a desk, on which I keep my computer and where I put bills I receive in the mail.
24.  After I learned of the lawsuit against me in late 2013 when I learned of the garnishment, I checked this area, and my files more generally, and confirmed that I had received nothing from WMC or Defendants relating to the lawsuit.

*Aglonu Aff*. at 16-24.

[12]  Indeed, even assuming the purported July 2013 letter is authentic and was sent, to the extent it was not received because it was not properly addressed, its sending would not constitute compliance with 15 U.S.C. Sec. 1692g(a).

32

SEA, and flatly denies that she received or acknowledged receipt of any such letter.  *Aglonu Aff.* 25-37.

Although credibility determinations are not at issue on summary judgment, it is worth noting that Courts have found the consumer's testimony more persuasive in similar contexts.  *See*, *e.g.*, *Auto Style Leasing v. Evans*, 1995 U.S. Dist. LEXIS 4228, 5-6, 1995 WL 144812 (S.D.N.Y. Mar. 31, 1995) (finding that a consumer's spouse's testimony regarding the specifics of a conversation was more reliable than a car dealer's, noting that because such a conversation was "not a frequent occurrence for most people, [the consumer's wife] would likely recall the surrounding events", and her testimony was therefore more reliable than that of the car dealer, "who presumably discusses expensive leases on a regular basis, the particular circumstances of defendant's lease would be less likely to leave a lasting impression.")

4. *SEA Misconstrues Aglonu's Allegations Regarding The November 2013 Letter And Errs In Asserting That It Was Entitled To Press Forward With Collection On A Judgment It Knew To Have Been Obtained By Deceit*

SEA next argues that it cannot be held liable because there was nothing deceptive regarding the November 2013 letter sent by its debt collector, Raymond Goodsen.  This argument misconstrues Plaintiff's complaint.

Plaintiff alleges that the November 2013 letter violated 1692g because it failed to contain the necessary disclosures required of initial communications.  *Complaint* at 75(c) ("Defendant Einstein violated the FDCPA by failing to include the required disclosures necessary under the FDCPA in an initial communication from a debt collector, in violation of 15 USC § 1692g(a).").

This allegation does not require Aglonu to demonstrate that the letter was deceptive (nor does it require tolling, as it is undisputed that the letter was both sent and received within one year of Aglonu's filing of this action).

Plaintiff also alleges that the November 2013 Letter shows:

that, at the time the November 2013 communication was sent, Einstein knew the underlying facts of the situation (that Westchester Medical Center had erred in billing Medicaid; that Medicaid had demanded a return of the payments it had made; and that the Local 1199 SEIU insurance coverage was rejected this two-plus year old bill.)

*Complaint* at 55.

Put differently, SEA was aware at the time it garnished Ms. Aglonu that the allegations and affidavits that had been used to obtain the $160,000 plus default judgment against Mrs. Aglonu were materially false, and chose – rather than informing Ms. Aglonu or the state court, to continue to leverage the judgment it knew to be infirm. [13]

This Court has repeatedly held that such conduct is actionable under the FDCPA.  In *Coble*, this Court stated:

> Moreover, defendants are still attempting to collect on the default judgments. Continued collection potentially legitimizes those judgments and conceals the fact that [the debt collection law firm] can no longer maintain a good faith belief in their validity.  . . .
>
> [By] continuing to enforce those judgments, defendants violated the FDCPA and concealed that violation in the process.

*Coble*, 824 F. Supp. 2d at 571.

Likewise, in *Sykes v. Mel Harris & Assocs.*, LLC, 757 F. Supp. 2d 413, 420 (S.D.N.Y. 2010), the Court held as follows:

> While the filing of a debt collection action alone does not violate the FDCPA, if the complaint was supported by affidavits that contained false or deceptive representations about the status and character of the debt, see 15 U.S.C. § 1692e(2)(A), (10), then the filing of the state action could also be deemed "unfair or unconscionable" in violation of 15 U.S.C. § 1692f. Plaintiffs do not merely allege that the [debt buyer] and [collection attorney] defendants "lack physical evidence of the debt," but that they knowingly authorized defendant Fabacher to file false affidavits of merit — misleading both the Civil Court and consumer-defendants — to secure default judgments that enabled them to freeze bank

---

[13] Because Plaintiff's claims against SEA focus, not on whether the November 2013 letter was deceptive, but rather whether SEA violated the FDCPA by pushing forward with post judgment execution on a judgment it knew to have been based on deceit, SEA's arguments regarding whether any mistatements in the letter itself were material is misplaced and irrelevant.

34

accounts, threaten to garnish wages, or pressure individuals into settlements. (Compl. ¶¶ 6-7, 116-18). The FDCPA claims against the [collection attorney] defendants are plausible, and their motion to dismiss them is denied.

*Id*. at *7.

In the instant case, the only potentially distinguishing feature is that SEA, while aware at all relevant times of the falsity of the underlying state court materials, was substituted into the collection case after the default judgment was obtained (but before it garnished Mrs. Aglonu). However, by failing to disclose its knowledge of the deceit and, instead, pressing ahead with post-judgment execution based upon judgments it knew to be infirm, SEA ratified and consented to the deceit, and became culpable. See 22 NYCRR Part 1200, Rule 3.3(a)(1); *DeAngelis v. Countrywide Home Loans, Inc. (In re Hill)*, 437 B.R. 503, 542 (Bankr. W.D. Pa 2010) (attorney had an obligation under Pennsylvania's identical rule to correct misstatements made to the court after becoming aware of their inaccuracy); *Lipman v. Dickinson*, 174 F.3d 1363, 1365-1366 (Fed. Cir. 1999) (attorney had a duty to notify the PTO that affidavits in support of his client had been recanted by affiants); New York Judiciary Law § 487 ("An attorney or counselor who. . . is guilty of any deceit or collusion, *or consents to any deceit or collusion*, with intent to deceive the court or any party. . . is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages.) (emphasis added).

*[rest of page intentionally left blank]*

## V.   **CONCLUSION**

For the above stated reasons, Defendants' respective motions should each be denied in their

entirety.

Respectfully,

*s/Daniel A. Schlanger*
Daniel A. Schlanger, Esq.
Schlanger & Schlanger, LLP
343 Manville Road
Pleasantville, NY 10570
T. (914) 946-1981, ext. 101.
F. (914) 946-2930
daniel.schlanger@schlangerlegal.com

*Attorneys for Plaintiffs*

36